TAD, INC., Plaintiff-Appellant and Cross-Appellee, *v.* JOHN H. SIEBERT *et al.*, Defendants-Appellees and Cross-Appellants.

First District (4th Division)    No. 77-217

Opinion filed August 24, 1978.

George W. Hamman and Jill Nickerson, both of Chicago, for appellant.

J. William Holland, of Holland & Holland, and J. Samuel Tenenbaum and Theodore M. Becker, both of Becker & Tenenbaum, both of Chicago, for appellees.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

The plaintiff, TAD, Inc., brought this action to recover damages

sustained due to the alleged tortious conduct of the defendants. Following a bench trial in the circuit court of Cook County, a verdict was entered in plaintiff's favor. Plaintiff appeals from that portion of the judgment order which provided for damages in the amount of $4206.45. The defendants cross-appeal.

The issues presented for review are (1) whether the trial court erred in holding that defendants' conduct constituted a tort entitling plaintiff to judgment, and (2) whether the trial court erred in its determination of plaintiff's damages.

The record reveals the facts to be as follows: The plaintiff, TAD, Inc. (hereinafter referred to as TAD), is engaged in the business of contract engineering services. On April 29, 1974, TAD purchased the assets of Alpha Technical Services, Inc. (hereinafter referred to as Alpha), including that portion of Alpha's business which consisted of providing the services of temporary technical personnel. Alpha would receive a request from a customer for a certain type of technical person needed by the customer to do a particular job for an indefinite period of time. Payment for the technician's services would be received by Alpha. Alpha, in turn, paid the technician a portion of that amount and used the balance to meet its operational costs and produce a profit. TAD purchased from Alpha the following:

"* * *accounts receivable, prepaid expenses, work in process, office furniture and fixtures, trademarks, trade names and copyrights, if any, the use of Seller's corporate name, computer software, existing contracts with, and any outstanding proposals to, customers, together with all historical files in Seller's various offices or in storage relating to such contracts and proposals, all professional resumes, and the right to possess and occupy the several offices of [Alpha]."

TAD operates the business acquired from Alpha under the name of Alpha Technical Services—Division of TAD, Inc. (hereinafter referred to as Alpha-TAD).

Defendants Halperin and Siebert were employed by Alpha for several years prior to April 29, 1974. Siebert was vice president in charge of internal administration; Halperin was a sales representative. At the time of the acquisition, Alpha had a "pool" of personnel which it had developed over a number of years, from which it could draw to fill a customer's requirements. Although plaintiff argued that Alpha-TAD's "pool" of qualified personnel was a closely guarded business asset, the facts show that the technical services industry is highly competitive and engaged in by a number of companies, and that many of plaintiff's qualified personnel are "listed" with more than one company. Both defendants were offered continued employment with Alpha, but both declined and resigned. According to plaintiff, these defendants then immediately started

competing with plaintiff for "employees" and customers in providing temporary technical personnel. Shortly after April 29, 1974, they formed the defendant corporation, Halperin & Siebert, Inc. In their effort to seek business, defendants ran newspaper advertisements and sent out announcements. Defendants contacted 18 Alpha-TAD "employees" and attempted to persuade them to leave Alpha-TAD by offering an increase in salary. Defendants also contacted Alpha-TAD's customers, and in several instances customers under contract to Alpha-TAD entered into contracts with the defendants. Defendants hired 11 of Alpha-TAD's personnel and were able to do business with Alpha-TAD's customers for whom these personnel were working. Defendants placed these people and others from Alpha-TAD's "pool" with a number of Alpha-TAD customers. Plaintiff, in response, made a reasonable effort to retain these employees and customers at a substantial expense.

The record also indicates that prior to leaving Alpha, defendants Halperin and Siebert took with them no customer lists or any other documentation, nor did they memorize any material or confidential information; they were searched and nothing was found on their persons or taken from them. Testimony was elicited that persons experienced in the field of contract engineering are generally well acquainted with both the customers in the market and the available talent. In fact, lists of the names of potential customers are published by contract engineering firms in their advertising material and are available to persons acquainted with "the business." Furthermore, plaintiff's "out-of-house" service, *i.e.*, the placement of engineering personnel on jobs with various companies, is based upon contracts at will, terminable by either the plaintiff, the employee, or the employer (customer); there is generally no set duration for these jobs.

In its complaint, plaintiff charged that by their actions defendants had engaged in three types of tortious conduct:

(1) Interference with plaintiff's contracts with its customer;

(2) Inducing, or attempting to induce, plaintiff's employees to leave such employment and start work for defendants;

(3) The wrongful use of confidential business information belonging to plaintiff, *i.e.*, the names, addresses, telephone numbers, and qualifications of qualified persons employed by plaintiff or available for employment.

Plaintiff prayed that defendants be temporarily and permanently restrained from their tortious conduct and for judgment against defendants, jointly and severally, in the amount of $100,000 plus costs and attorney's fees.

At trial, defendants admitted their conduct was substantially as alleged by plaintiff, but denied that such conduct was tortious. Following a bench trial, the trial court found as follows:

"This court finds that the defendants have interfered with the employees and customers of the plaintiff, in that they went to the employee on a job and asked him to work for them on the same job, and also asked the employer of that person to go along with them.

This is conduct that is contrary to the law.

The court further finds that there were nine such employees interfered with, and further finds as to all the other issues in favor of the defendants.

The court further finds that the damage to the plaintiff is in the sum of $4206.45, as was set out by Defendants' Exhibit No. 16, the court using the related costs submitted by the defendants in the amount of 14.96 per cent instead of 13.4 per cent submitted by the plaintiff.

Accordingly, there will be judgment in the amount of $4206.45 in favor of the plaintiff against the defendant[s]."

Plaintiff argues on appeal that the trial court erred in its determination of the amount in damages plaintiff is entitled to recover. According to plaintiff, a party is entitled to be compensated for all damages proximately caused by the commission of a tort (*Bimba Mfg. Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 256 N.E.2d 357), and the purpose of awarding compensatory damages is to make the injured party whole. (*Santiemmo v. Days Transfer, Inc.* (1956), 9 Ill. App. 2d 487, 133 N.E.2d 539.) Plaintiff claims that at trial evidence was introduced of damages totaling $56,659.47 which were proximately caused by defendants' tortious conduct. These included plaintiff's net loss of revenues as a result of defendants' interference with its employees and customers, expenses incurred by plaintiff in its effort to retain its employees and customers, and net revenue lost as a result of defendants' placement of plaintiff's former employees and other persons with plaintiff's customers. Plaintiff maintains that the trial court erroneously limited plaintiff's recovery to the net profits, as calculated by defendants, that it would have earned on the completion of contracts with customers for work done by nine of plaintiff's former employees.

The defendants cross-appeal and contend, as they did in the trial court, that their conduct did not constitute a tort entitling plaintiff to judgment. According to the defendants and based upon the finding of the trial court, the sole issue with respect to defendants' liability is whether as a matter of law specific acts of the defendants constituted a tortious interference with contract. We agree with the defendants; therefore, we reverse the judgment, and enter judgment and finding for the defendants.

■■ Illinois courts, through recent decisions, have encouraged fair competition in business while exhibiting an abhorrence of restraint of trade. (*Ellis & Marshall Associates, Inc. v. Marshall* (1973), 16 Ill. App. 3d

398, 404, 306 N.E.2d 712, 716-17; *Kalnitz v. Ion Exchange Products, Inc.* (1971), 2 Ill. App. 3d 158, 161, 276 N.E.2d 60, 62-63; *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 357, 228 N.E.2d 742, 746; *Beltone Electronics Corp. v. Smith* (1963), 44 Ill. App. 2d 112, 115, 194 N.E.2d 21, 23-24; *Professional Service Corp. v. Johnson* (1942), 316 Ill. App. 431, 436, 45 N.E.2d 191, 193.) In *Ellis*, the court held that a former employee, in the absence of any restrictive covenant in his employment contract or fraud, may compete in business with his former employer without breach of any existing fiduciary duty, so long as there was no demonstrable business activity on his part prior to resigning. (*Ellis*, at 717.) In *Kalnitz*, the court stated that:

"* * * [I]n the absence of an express contract, a taking of a customer list, or fraud, a former employee may not properly be enjoined from soliciting his former employer's customers whom he served during his employment." (*Kalnitz*, at 161.)

In *Revcor, Inc.*, the court stated that:

"Our free economy is based upon competition. One who works for another cannot be compelled to erase from his mind all of the general skills, knowledge, acquaintances and the over-all experience which he acquired during the course of his employment. The success of a person who is engaged in sales depends largely upon his personal friendships and the confidences inherent therein. Absent special circumstances, such person cannot be prevented from seeking out customers of his former employer when he has entered into a competing business or gone to work for a competitor.

If a salesman has agreed to a restrictive covenant in his employment contract, or if he has fraudulently and surreptitiously copied or removed lists of customers from a prior employer, or if the names of actual or potential customers are confidential, not subject to memory, are not publicly listed or otherwise readily obtainable, then, under proper circumstances, such salesman might be enjoined from soliciting business from the customers of his prior employer. Absent such circumstances, however, there can be no such prohibition." (*Revcor, Inc.*, at 357.)

In *Beltone Electronics*, at page 117, where the defendant employee's employment contract did contain a restrictive covenant, the court refused to enforce that covenant where it went beyond the limits necessary to protect the former employer, where it therefore constituted an unreasonable restraint on trade, and where the defendant employee was found innocent of any reprehensible conduct or the use of any trade secret belonging to his former employer.

■■ In the instant case, defendants Halperin and Siebert did not engage in any competitive activity while still in plaintiff's employ. The record

establishes that defendants are not alleged to have engaged in any objectionable activity prior to the date of their resignations. Subsequent to that date, these defendants formed their own business, the defendant corporation, and began to compete with their former employer in its field of business. The record does not show that defendants' employment contracts with plaintiff contained any covenants restricting defendants' future employment or business activity. In competing freely with plaintiff, defendants, who are experts in their field, were free to solicit the business of plaintiff's customers with whom they had become well acquainted while in plaintiff's employ. (*Kalnitz*, at 161; *Revcor, Inc.*, at 357.) This conduct was not contrary to the law. There is no evidence that defendants, who were searched before leaving plaintiff's employ, surreptitiously copied or removed any confidential lists of customers or employees belonging to plaintiff. There is evidence that any lists of the customers within this limited field (contract engineering) are well published and are generally available to persons within the field. Furthermore, testimony was elicited that experienced persons in the field of contract engineering, such as the defendants, are generally well acquainted with both customers and available talent ("employees") in the market. Therefore, we cannot sustain plaintiff's allegation that defendants wrongfully made use of any confidential business information belonging to plaintiff.

■■ ■ Under the circumstances of the instant case, defendants' acts in attempting to enter into employment contracts with plaintiff's alleged employees did not constitute a tort. The record reveals that these employees were only employees "at will"; they were free to terminate their contractual relationship with plaintiff at any time. In fact, the employees in plaintiff's alleged "pool" were not under exclusive contract with plaintiff but were often simultaneously listed as available for employment with various companies. Plaintiff cites *Doremus v. Hennessy* (1898), 176 Ill. 608, 52 N.E. 924, as authority for its position. In *Doremus*, the plaintiff charged that the defendants by threats, false representations, and intimidation had induced her employees to break their contracts with her. That court held that an action may be maintained for the *malicious* interference with the business of another. It is also true that where there is malicious interference with an employment contract, it is immaterial whether it is for a fixed period or a contract terminable at will if both parties would have been willing and desirous of continuing the employment under that contract for an indefinite period of time. (*London Guarantee & Accident Co. v. Horn* (1903), 206 Ill. 493, 507, 69 N.E. 526, 531.) However, in the instant case, there is no evidence of any malicious conduct on the part of defendants who, in the course of free and legitimate competition, offered higher salaries to a number of personnel under contract to plaintiff. It is not apparent that defendants made any false representations, threats, or

engaged in any surreptitious conduct which induced any personnel to terminate their employment contracts with the plaintiff. As Judge Learned Hand stated in *Triangle Film Corp. v. Art Craft Pictures Corp.* (2d Cir. 1918), 250 F. 981:

> "That nobody in his business may offer better terms to an employé, himself free to leave, is so extraordinary a doctrine, that we do not feel called upon to consider it at large." *Triangle Film Corp.*, at 983.

Since we find that defendants did not engage in any tortious conduct injurious to plaintiff, we will not discuss the issue of damages raised by plaintiff.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and judgment and finding for defendants are entered.

Reversed.

DIERINGER and ROMITI, JJ., concur.